# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **GARY ANDERSON,** | ) | **CASE NO. 8:06CV332** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| **DOUGLAS COUNTY SCHOOL** | ) | |
| **DISTRICT 0001,** | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the motion for summary judgment filed by the Defendant, Douglas County School District 0001, which is the public school district for much of the City of Omaha and will be referred to as "OPS." The Plaintiff, Gary Anderson, alleges that his employment with OPS was terminated in January 2005 in violation of his right to free speech under the First Amendment to the Constitution. The matter has been briefed, and for the reasons provided below, the Court concludes that the Defendant is entitled to summary judgment as a matter of law.

## UNDISPUTED FACTUAL BACKGROUND

On January 20, 2004, Anderson was hired by OPS as a Technical Support Coordinator in its Information Management Services Department (Filing No. 54,[1] Declaration of Edward Virant ("Virant Dec.") at ¶ 2). Anderson has acknowledged that his employment was at-will. (Balus Dec., Ex. A1, Anderson Dep. 102:1-11). Anderson's employment was terminated by the OPS Board of Education ("Board") in January 2005 upon the recommendation of Dr. Sandra Hodges, OPS's Director of Human Resources.

---

[1] All references to the record may be located at filing nos. 54 or 66 unless otherwise indicated.

Hodges's letter to the Board set forth several reasons for her recommendation. The letter identified certain situations in which Hodges concluded that Anderson had exercised poor judgment or exhibited a lack of professionalism. Three such situations have been described in deposition testimony.

Hodges became aware of the first situation in April 2004. Shortly after Anderson was hired, he became concerned that he and other OPS employees might be underpaid or overpaid. In February 2004, based on his own concerns about his wages and similar concerns expressed to him by other employees of the IMS department (whose names he could not recall), Anderson authorized a staff member to extract confidential payroll information for approximately 22 to 50 employees from the OPS database. (Anderson Dep. 16:4-21, 20:23-24; 44:5-45:25; 128:2). Upon review of the information, Anderson took the information to his supervisor, Dr. Thomas McClung, and to Kelly Ramm, the Human Resources Manager of Compensation and Benefits. (Anderson Dep. (Anderson Dep. 45:10-46:2, 131:11-22). Anderson did not report his concerns regarding payroll to anyone outside of OPS. (Anderson Dep. 133:11-13).

Two months later, Hodges and Ed Virant, an OPS Human Resources Administrator, learned that Anderson had initiated the compilation of data. Hodges and Virant met with Anderson to inform him that he did not have authority to order such a report, in part because it contained confidential salary information about other employees, and they directed Anderson to refrain from such conduct in the future. (Anderson Dep. 56:19-57:11; 66:11-21; Hodges Dep., Ex. A2, at 27:11-24; 31:9-12).

A second situation was investigated by Virant in July 2004. Another IMS employee, Lana Aduloju,[2] complained to Virant that she had been in a meeting with Anderson when Anderson made a remark that was racially insensitive and that upset her. (Ex. A3, Virant Dep.39:20-40:2; Hodges Dep. 54:7-19; Ex. B4, authenticated in Virant Dec. ¶ 5). Aduloju reported that Anderson had made a reference to African-American students being lazy. Aduloju took personal offense because her spouse and children are African American. Aduloju expressed her feelings to co-worker, Connie Wickham, and Virant asked Wickham to provide documentation of their discussion. (Virant Dep. 42:17-43:9; Ex. B3, authenticated at Virant Dec. ¶ 4). After gathering information from Aduloju and Wickham, Virant reported the complaint to Hodges. (Virant Dep. 45:13-46:12; Hodges Dep. 49:6-16; 54:1-5). Together, they met with Anderson and provided him with an opportunity to respond. Anderson denied making the statement. (Virant Dep. 46:22-47:6; Hodges Dep. 59:4-6). Hodges told Anderson that such comments, if made, were inappropriate, and she told Anderson that he was not to discuss the matter with Aduloju. (Virant Dep. 51:2-15). Because Aduloju's complaint could not be independently verified, no disciplinary action was taken against Anderson. (Virant Dep. 52:12-13; Hodges Dep. 60:3-6).

The third situation occurred when Anderson and an OPS human resources representative, Renee Sheehan, were interviewing a candidate for a job opening in the IMS department in October 2004. (Anderson Dep. 14:17; Ex. B5, Virant Dec. ¶¶ 6, 7). During the interview, the job applicant inquired about OPS's firewalls and the techniques OPS used to keep pornography and advertisements out of the schools. (Ex. B5). Anderson

---

[2] Aduloju had been considered for the position for which Anderson had been hired.

responded to the applicant's question by stating that OPS allowed pornography to go through to the students. (Anderson Dep. 14:15-19; Ex. B5). He also explained that he was joking. Sheehan reported Anderson's comment to Virant, who investigated, and who reported it to Hodges. (Virant Dep. 55:10-58:10). The next day, Virant, Hodges and Anderson met to discuss the incident. (Virant Dep. 59:6-19; Hodges Dep. 67:17-25). During that meeting, Anderson admitted that he made the comment, and he explained that it was made in jest and in an effort to put the candidate at ease. (Anderson Dep. 14:15-19; Virant Dep. 59:17-19; Hodges Dep. 74:1-20).

At the conclusion of that meeting, Hodges told Anderson that she was concerned that it was the third time in less than a year that she had to meet with him to discuss concerns, and, for that reason, Anderson would be suspended with pay pending a more comprehensive review of his employment with OPS. (Virant Dep. 60:12-62:8; Hodges Dep. 78:16-79:5). Anderson was escorted from the building and, pursuant to OPS's standard procedures, instructed not to have contact with OPS staff, students or parents pending the outcome of the human resources department's investigation. (Anderson Dep. 74:2-14; Virant Dep. 60:22-61:6; Hodges Dep. 78:2-7).

Virant conducted the investigation, which included gathering information relevant to Anderson's disciplinary and performance issues, and he prepared a report for Hodges's use. (Virant Dep. 73:1-24; Ex. B7, Virant Dec. ¶ 8; Hodges Dep. 80:12-17). Virant's investigation included anecdotal reports from other IMS employees. One recalled that Anderson publicly remarked that he would not follow McClung's direction; and one OPS Compensation and Benefits employee remarked that Anderson had been belligerent toward her during a meeting. (Virant Dep. 76:17-77:14).

Virant made a point to investigate the caliber of Anderson's performance from January 2004 through the date he was placed on paid suspension. (Virant Dep. 75:12-76:2; Hodges Dep. 80:18-23). Virant learned that on August 19, 2004, McClung met with Anderson to discuss Anderson's job performance. (Ex. B2, Virant Dec. ¶ 3; Anderson Dep. 84:13-16; 87:18-21; Hodges Dep. 81:15-23; 83:7-11). During the meeting, McClung told Anderson that he had not timely responded to emails and had not responded to requests for information made to the IMS department. (Anderson Dep. 89:17-20; 164, Ex. B2). McClung had been critical of Anderson's failure to update him about key activities or developments within the department. (Anderson Dep. 165:19-25). In an effort to improve Anderson's performance, McClung provided Anderson with a list of evaluation criteria that McClung intended to employ during future evaluations of Anderson. (Ex. A5, Performance Evaluation Criteria; Anderson Dep. 163:11-16). Virant included all this information in the report to Hodges. McClung has stated that after the 6-month evaluation, he noted improvement in Anderson's job performance.

After Hodges reviewed Virant's report, she gave Anderson an opportunity to respond. (Virant Dep. 78:12-15). The report formed the basis of a letter to Anderson dated November 23, 2004, wherein Hodges informed Anderson that she intended to recommend the termination of his employment to the OPS Board at their next meeting (Anderson Dep. 64:17-23, Ex. 17, also Ex. A6; Filing No. 66, p. 105). In the letter, Hodges outlined the reasons for her recommendation for termination, including that Anderson had exercised poor judgment and had exhibited both unprofessional and insubordinate conduct during his employment. (Ex. A6). The Board accepted Hodges's recommendation, and Anderson's employment was terminated. (Ex. A7, Termination letter, Anderson Dep. Ex.

18, 167:11-18). Anderson believes that his termination was the result, at least in part, of the allegedly racial comment and the comment about pornography reaching students. (Anderson Dep. 27:9-12). However, he also believes that he was fired because he told his supervisors when he believed something was amiss at OPS.

In deposition testimony, Anderson identified four occasions when he made statements that he believes are protected speech under the First Amendment, and for which he was discharged. (Anderson Dep. 129:12-130:23; 133:14-138:24). The first example identified by Anderson is his complaint to McClung that he and other new employees were not being paid correctly. Anderson believed that there was an irregularity in the software program or its use by OPS that resulted in new employee being underpaid. Because of this concern, he directed another employee to compile the salary data. Anderson has stated that he expressed his concerns to McClung and directed the report to be prepared pursuant to his job responsibilities. (Anderson Dep. 148:19-22). Later, Hodges explained to him that directing the compilation of employees' confidential pay information was outside of his responsibilities and he lacked authority to order such reports. (Ex.A6). The second and third examples are that Anderson made reports to McClung regarding irregularities he perceived in outside vendor contracts and fee payments. (Anderson Dep. 133:20-25). In connection with the outside vendor contracts, Anderson informed McClung that a service contract with an outside vendor had not been properly approved, and that a programming services contract was not authorized. (Anderson Dep. 135:13-137:3). Anderson also reported to his supervisor that there was a problem with the "SASI" software, specifically that OPS had installed unauthorized software because there was no funding mechanism in place for it. (Anderson Dep. 137:6-

22; 141:18-142:2). Anderson has acknowledged that making the reports of these perceived deficiencies was within the scope of his employment. (Anderson Dep. 137:10-22; 141:25-142:2).

The final instance of protected speech, according to Anderson, involved his reporting of a discrepancy of approximately $ 1 million between OPS's data ledger and OPS's bank statements. The undisputed evidence, however, is that Anderson was asked to provide technical assistance to OPS's Accounting and Finance Director, Joyce Southard, who was charged with investigating the discrepancy. Dr. Dennis Pool, who is the Assistant Superintendent for General Administrative Services for OPS, explained that the discrepancy had been identified well in advance of Anderson being asked to lend his technical expertise to finding the source or cause of the discrepancy. (Anderson Dep. 139:7-25; Ex. A4, Pool Dep. 3, 6:12-18:19). McClung testified that he knew of the issue before Anderson was hired. (Filing No. 66, McClung Dep. 45:11-13). There is no dispute that providing such technical assistance was part of Anderson's job. (Anderson Dep. 139:17-19; Pool Dep. 16:12-13; 17:13-18:12). Anderson admits that he never spoke to any members of the public concerning the discrepancy or any information that he may have uncovered. (Anderson Dep. 140:15-17).

The issues Anderson raised with his supervisor concerning unauthorized contracts, improperly paid maintenance fees, and the $1 million discrepancy, were matters outside the responsibilities of OPS's Human Resources department, and were not known to Virant and Hodges at the time Hodges made the decision to recommend Anderson's termination. (Virant Dep. 21:19-25:21; Hodges Dep. 102:15-103:19). According to Virant, Anderson's

7

expression of these concerns formed no part of the decision to recommend Anderson's termination. (Virant Dep. 78:6-11).

## STANDARD OF REVIEW

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *Davison v. City of Minneapolis*, 490 F.3d 648, 654 (8th Cir. 2007). The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The proponent need not, however, negate the opponent's claims or defenses. *Id.* at 324-25.

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." *Id.* at 586. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249-50 (citations omitted).

8

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp.*, 477 U.S. at 327.

## ANALYSIS

Anderson's claim against OPS is brought under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern. *Pickering v. Board of Ed.*, 391 U.S. 563, 568 (1968). *Pickering* sets forth the analytical framework used to evaluate a public employee's claim based on an unlawful infringement of First Amendment rights. The first inquiry is to determine whether the employee spoke as a citizen on a matter of public concern. If the answer is negative, then the employee has no First Amendment cause of action based on his employer's reaction to the speech. Only if the answer to the first inquiry is yes, will the analysis continue. In this case, the Court finds that Anderson cannot clear the first hurdle, and the Defendant is entitled to summary judgment as a matter of law.

In considering whether a public employee is speaking as a citizen on a matter of public concern, the Supreme Court provided some guidance last year in *Garcetti v. Ceballos*, --- U.S. ----, 126 S.Ct. 1951 (2006).  The Court stated:

9

> So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.

*Id.* at 1958. In *Garcetti*, the Court found the controlling fact to be that the public employee's statements were made pursuant to his job duties, and therefore, the Court found that the statements were not protected speech under the First Amendment. The Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communication from employer discipline." *Id.* at 1960.

The Eighth Circuit Court has considered *Garcetti*, and recently stated:

> Our first inquiry is whether [the plaintiff] has asserted a First Amendment violation. In *Garcetti v. Ceballos*, --- U.S. ----, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court recently clarified the inquiry for whether a public employee receives First Amendment protection. As the Court reinforced: "public employees do not surrender all their First Amendment rights by reason of their employment." *Id.* at 1957. But to trigger constitutional protection, an employee must "speak as a citizen addressing matters of public concern." *Id.* (citing *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).

*Lindsey v. City of Orrick, Missouri*, 491 F.3d 892, 897 (8th Cir. 2007).

Anderson claims that he exercised his First Amendment rights in reporting the improper calculation of his wages, the unauthorized vendor contracts, improperly paid maintenance fees, and the $1 million discrepancy. However, Anderson defeats his own claims by acknowledging that he made each of these expressions pursuant to his job responsibilities. The Eighth Circuit court has stated: "After *Garcetti*, a public employee does not speak as a citizen if he speaks pursuant to his job duties. *See McGee v. Pub. Water Supply, Dist. # 2*, 471 F.3d 918, 919 (8th Cir. 2006) (holding a public water supply

district manager's complaints about environmental compliance, although involving matters of public concern, were made pursuant to his official duties to ensure regulatory compliance and thus were not made as a citizen)." *Lindsey v. City of Orrick, Missouri*, 491 F.3d 892, 898 (8th Cir. 2007).

Even without Anderson's admission, the context of the speech demonstrates that Anderson was speaking as an employee, and not a citizen, and that the subject of his statements was not a matter of public concern. "The . . . inquiry is a practical one." *Garcetti*, 126 S.Ct. at 1961. The Court finds that no reasonable person could conclude that Anderson's complaint about his pay or wages related to a matter of public concern. Anderson was concerned that he was not being paid sufficiently in comparison to other OPS employees. He presented his concern to his supervisor, McClung, in the hope of getting more pay. These facts demonstrate an undeniably private concern. Even if Anderson's motivation was more broadly based, as McClung seemed to believe it was, Anderson's expression of concern for his co-workers' compensation and treatment does not transform the topic into one of public concern. Rather, it only emphasizes the employment-related nature of the expression.

Moreover, there is no dispute that part of Anderson's job was to review vendor contracts and fee agreements within the IMS department. In addition, there is no dispute that the technical forensic work that Anderson performed in conjunction with Southard's investigation of the "missing" $1 million was performed at the direction of OPS superiors and in the scope of Anderson's employment. While Anderson's work may have related to a matter of public concern with respect to the public fisc, any statements or expressions

11

that Anderson made were so closely related to his job responsibilities that they are not protected.

The Court does not view this as a close case; this case does not present the type of facts that gave pause to the dissenting Justices in *Garcetti.* Anderson's expressions do not constitute "speech unwelcome to the government but on a significant public issue." (J. Souter dissenting.)  Indeed, OPS directed him to speak on all of these issues, except the compensation issue.

Even if the speech could somehow be viewed as protected, the Defendant would still be entitled to summary judgment because there are no facts to show that Anderson's expressions caused or contributed to his termination.  Hodges's and Virant's undisputed testimony is that they had no knowledge of Anderson's statement to McClung about the vendor contracts and the maintenance fee arrangements, or of Anderson's forensic work on the "missing" $1 million, before Hodges prepared the recommendation to the OPS Board to terminate Anderson's employment.  Though Hodges and Virant knew of Anderson's involvement in the preparation of the IMS employees' salary report, Hodges viewed that as an example of Anderson's lack of judgment and professionalism based on his accessing of confidential employee information.  (ExA6).  Thus, evidence demonstrating that Anderson's speech "was a substantial or motivating factor" in the decision to terminate his employment is wholly lacking.  *Davison,* 490 F.3d at 656 (8th Cir. 2007); *See also, Hudson v. Norris*, 227 F.3d 1047, 1050-51 (8th Cir. 2000) (stating that to establish a prima facie case of unlawful retaliation under the First Amendment, an employee must show that he or she participated in a protected activity, that the employer

12

took an adverse employment action against him or her, and that a causal connection existed between the protected activity and the adverse employment action.)

For all these reasons,

IT IS ORDERED:

1. Defendant's Motion for Summary Judgment (Filing No. 52) is granted;

2. A separate judgment shall be entered, but not until Defendant's counsel notifies the Court whether Defendant intends to withdraw the Statement of Appeal (Filing No. 56). The notification shall be provided as soon as is practicable, but in any event, not later than January 3, 2008.

DATED this 21st day of December, 2007.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge